## J. D. LONG v. THE STATE.

1. POSSESSION OF COUNTERFEITING MATERIAL — INDICTMENT.— The offense of having in possession moulds and material used in counterfeiting current coin, with the intent to so use them, as defined by the Penal Code, article 464, is an offense separate and distinct from the offense of counterfeiting as defined by article 469 of the Code, and hence, an indictment for the first offense should not charge the constituent elements of the latter. See the opinion *in extenso* for an elaboration of the question.

2. EVIDENCE.— As a standard of. comparison to prove handwriting, the witness adopted a letter to himself purporting to be from one W., a penitentiary convict, the authorship of which letter was subsequently acknowledged by W. It was objected that the admission of W., he being a convict and thereby rendered infamous and incompetent as a witness, was incompetent to qualify the letter as a standard of comparison; which objection was overruled.   *Held,* error; and that no fact stated by or derived from a convict, can, so long as the disability remains, be detailed as testimony by another, or used as evidence against a third party for any purpose.

3. SAME.— To the admission of the testimony of the officials of the penitentiary to the effect that certain convicts in their custody, to whom the accused had access, were convicted for counterfeiting, the defense interposed the objection that the best evidence was the record of their conviction.   *Held,* that, inasmuch as the officials had them in charge by legal process certifying their conviction, and they not being in possession of the record evidence, it was competent for them to state the offense of which the convicts had been convicted, as certified to them.   And *held* further that this evidence was merely of a collateral fact involved in the investigation.

4. SAME.— A receipt found upon the person of the accused, and purporting to designate the ingredients of a compound suitable for counterfeiting purposes, was properly admitted in evidence; and the trial court did not err in permitting experts to testify that the composition thus formed would produce a material used in counterfeiting silver coin.

5. NEW TRIAL — CASE STATED.— A juror on his *voir dire* disclaimed bias or prejudice, or any conclusion as to the guilt or innocence of the accused; but it is shown by the affidavits of two jurors that, before the jury was fully empaneled, he said to them that "he was a poor juror for the defendant;" and by the affidavits of the accused and his counsel that these facts were unknown to them until after the trial, and further that the defense had not exhausted its challenges when the jury was completed.   The counter-affidavit of the impugned juror sets up that he was not biased or prejudiced against the defendant, and had not, when he qualified himself, formed any conclusion as to his guilt or innocence, but does not deny or explain the remarks imputed to him.   *Held,* sufficient ground for new trial.

APPEAL from the District Court of Walker.   Tried below before the Hon. W. A. WOOD.

The indictment charged that the appellant, in Walker county, on the 5th day of January, 1880, had in his

" possession a mould adapted for making coin, with the intention of committing the offense of counterfeiting, and with the intent to use said mould for the purpose of counterfeiting the silver coin of the United States, of the value and denominations of one dollar; contrary," etc.

His trial resulted in conviction, and the punishment assessed was confinement in the penitentiary for the period of two years.

J. M. Parish testified for the State that, in January, 1880, he was deputy sheriff of Walker county. The justice of the peace, Mr. Williams, placed a search warrant in his hands and directed him to search the room and person of the accused. The witness found the accused in the yard of the penitentiary building, and upon searching his person found in the inside pocket of his vest a mould made of plaster-of-Paris. The mould was closed when the witness first got possession of it, and was opened the next day on the examining trial held by Justice Williams. The witness opened it with a knife. It had in it a legal tender silver coin dollar of the United States. A white mould, fitting closely around a silver dollar when closed, each half of the mould having a distinct impression of letters, figures, lines, etc., corresponding with those on the sides of a United States legal tender dollar, was here shown to the witness, and identified by him as the mould which he found on the person of the defendant. After taking this mould from the person of the defendant, the witness went to the room of defendant and broke open his trunk, which was locked, finding in it the piece of metal exhibited. It is a piece of very fine grained Babbitt's metal. They also found in the trunk the paper now shown him, which was a formula or recipe.

The witness had marked this paper " A., Jan'y 7," for the purpose of identifying it in the examining court. The witness also found in the trunk the packages now

exhibited to him; that marked B. containing a small quantity of white powder; that marked C. containing a small quantity of white powder, and that marked D. containing six coins. The witness had seen some "right good coins made of Babbitt's metal. Such metal was much used about the penitentiary."

On cross-examination the witness stated that, when he told the accused that he was going to search his trunk, the accused did not object. The witness had never seen counterfeiting done, did not know that money could be made with the moulds taken from the person of the accused, but believed that it could.

L. P. Davidson, for the State, testified that in January, 1880, he was a druggist and chemist, doing business in Huntsville, Walker county, Texas. Two or three days before the examining trial of the accused, he came to the witness' drug-store and purchased four and one-half ounces of plaster-of-Paris. The mould identified by Parish being exhibited to the witness, he testified that it was made of plaster-of-Paris. The amount of plaster-of-Paris sold by witness to accused was amply sufficient to make a mould of the size of the one exhibited. The package marked B. was then handed to witness, and he pronounced the contents plaster-of-Paris, and was certain that the paper enclosing it was the same paper in which he wrapped the plaster-of-Paris he sold the accused. The paper marked C. was handed witness and he stated that he believed the contents to be sulphate of potash. Sulphate of potash is used in making Dover's powders, but witness did not know its mechanical uses. Plaster-of-Paris is used generally for making moulds.

J. F. West testified for the State that he was an engineer by profession. The piece of metal identified by Parish was handed him and he pronounced it Babbitt's metal. The witness was present when the mould was taken from the person of accused, but was not present

when his trunk was opened. The accused was a night-guard in the east building of the penitentiary, and had charge of Little and Curtis, who were under sentence for counterfeiting. He had charge also of a convict named Weaver, who was a cell-mate of one Hale, convicted of counterfeiting. The witness was under-keeper at the time, and had charge of the discipline of the prison.

Cross-examined, the witness said that he had taken some powder like that exhibited in court from Little's coat. A few days before that the defendant asked permission to have a convict open his trunk, stating that he had lost his keys.

Haywood Brahan testified for the State that in January, 1880, the defendant was night-watch in charge of the east building of the penitentiary, and as such had opportunities to confer with convicts who could make moulds like that exhibited in court. The witness was not present when the mould was found on the defendant's person, but was present when the trunk was opened by Deputy Sheriff Parish. The trunk had a spring lock, and a key was in it, but the lock had to be taken off to get the trunk open. The metal shown witness, the same identified by Parish, is Babbitt's metal. The difference between this and block tin is that the metal is easier worked. The witness had heard that Babbitt's metal is used in counterfeiting, but did not know of his own knowledge. There are many convicts in the penitentiary for counterfeiting, and some for having in their possession moulds for counterfeiting. As night-guard, the defendant had access to all of the convicts in the east building every night.

Cross-examined, the witness said there was one convict in the penitentiary sent for having moulds in his possession, who was "knocking about on the inside of the walls."

T. J. Goree, for the State, testified that he was, and had been for several years, superintendent of the Texas

State Penitentiary. The defendant had been a night-guard in charge of the east building for several months next preceding the 6th day of January, 1880. During the defendant's service there were in the east building three convicts sent for counterfeiting and dealing in counterfeit money. While defendant was night-guard, he was the only citizen who had access to the convicts in the east building from dark until daylight. The paper marked "A. Jan'y 7" was shown to witness, and he testified that he believed he knew in whose handwriting it was written. All letters to and from convicts were required to pass through the witness' hands. The witness had never seen Frank Weaver write, but from seeing letters purporting to have been written by him in reply to letters received by him, and from notes to the witness purporting to have been written by him and afterwards spoken of by him (Weaver) as notes he had written, the witness was satisfied that this paper marked "A., Jan'y 7" was in Weaver's handwriting. It is signed "H. & W. & Co." Just before the arrest of the accused (Jan'y 6, 1880), and for some time before that date, Weaver had been a cell-mate of a man named Hale, who was confined for counterfeiting. On Monday, January 5, 1880, before the arrest of the defendant, and while in charge of the east building, some convicts escaped from their cells in that building, and among the number were Weaver and Hall. The convicts were recaptured.

After the escape of Weaver, a letter was found addressed to the witness purporting to have been written by Weaver. Weaver afterwards spoke to the witness about the contents of this letter, and spoke of it as having been written by him. That letter and the paper marked "A., Jan'y 7" are in the same handwriting.

*L. B. Hightower*, for the appellant. The first assignment of error relates to the admission of the testimony

of L. J. Goree as to the handwriting of the convict Weaver. Goree testified that, from seeing letters purporting to be written by Weaver, and which Weaver afterwards admitted to be written by him, the receipt was in Weaver's handwriting. We submit that the witness was not qualified to testify as to the handwriting.

It does not help the case to say that Weaver admitted writing the letters from which the witness Goree derived his knowledge. Weaver was a convict, and no testimony or admission of his could be used in evidence against appellant Long. Because to allow such testimony would destroy the well-known rule that a felon cannot testify. In this case the court admits Weaver's statement to be used in evidence against defendant, even when the same was not made under oath.

The second assignment complains of the admission in evidence of a certain receipt. The court says, in approving our bill of exception, that the receipt was admitted as a circumstance. We submit that it could be no circumstance, because it was in no manner connected with the case at bar by any sort of testimony. A cure for chills and fever might just as well be admitted as a circumstance, and yet the State's counsel were allowed to argue that this receipt was for making counterfeit coin, when there was not a word of testimony to that effect. Certainly the rules of evidence were intended for some purpose.

The third assignment is for overruling the motion for a new trial. We ask this court to examine our motion, and then say if the juror Gillespie was not an incompetent juror. He had answered on his *voir dire* that he had formed no opinion as to the guilt or innocence of the defendant; that he had no bias or prejudice. That was our only way of testing the juror, and yet, before the sworn answers had died from his lips, he tells two men that he "is a bad juror for the defendant," and argued

with one as to the guilt of defendant. If he was a " fair and impartial juror," then there are no unfair or partial jurors. We ask a careful examination of our motion for new trial.

Our fourth assignment, relating to the sufficiency of the indictment on motion in arrest, we think fatal to the State's cause. The court will perceive that the indictment is for having in possession moulds with the intent of counterfeiting. Now, counterfeiting is not defined in the indictment. The statute under which the indictment is drawn is exactly similar to the statute for burglary with intent to commit theft. (Penal Code, arts. 464 and 704.) Now, an indictment for burglary with intent to commit theft must contain a full description of the crime of theft; must, in other words, describe theft in "plain and intelligible words." The entry of the house constitutes no crime, without the intent to steal. So in this case, having the moulds is no crime, but having them with the intent to counterfeit is a crime. Then why should not the indictment define counterfeiting as burglary indictments define theft? This point has been well settled in numerous decisions.

It will not do to say that in an assault to murder it is not necessary to define murder, because in the assault the crime is committed, and the intent to murder is an aggravation of the crime which is contained in the assault, and there can be a crime well described without murder making a component part of that crime. In burglary, and in the case at bar, there exists an obvious difference. In burglary with intent to steal, theft is absolutely necessary to make out the crime. Without the intent to commit theft there can be no crime. So in having moulds in possession, without the intent to counterfeit, there can be no crime. Counterfeiting is a *sine qua non* to the offense sought to be charged in the indictment in this case. Without the intent to counterfeit there can be no crime.

Then is it not absolutely requisite in the indictment to define and describe counterfeiting? If not, then we can use technical expressions in the charging part of an indictment with impunity, and laugh at the statute which requires the offense to be stated "in plain and intelligible words."

*Horace Chilton*, Assistant Attorney General, for the State, filed an able brief.

White, P. J.   The indictment in this case charges that "J. D. Long, in the county of Walker in the said State, on the fifth day of January in the year of our Lord eighteen hundred and eighty, did then and there have in his possession a mould adapted for making coin, with the intention of committing the offense of counterfeiting, and with the intent to use said mould for the purpose of counterfeiting the silver coin of the United States of the value and denomination of one dollar," etc.   This indictment was brought under an article of the Penal Code which reads thus: "If any person, with the intention of committing the offense of counterfeiting, or of aiding therein, shall make or repair, or shall have in his possession any die, mould, or other instrument whatever, designed or adapted or usually employed for making coin, or shall prepare or have in his possession any base metal prepared for coinage, with intent that the same may be used for the purpose of counterfeiting, he shall be punished by imprisonment in the penitentiary not less than two years nor more than five years."   Penal Code, art. 464.

In the motion in arrest of judgment, the indictment was controverted as to its sufficiency in the description of the offense because it failed to allege the ingredients, elements, or constituents of the crime of counterfeiting, which is defined in the statute as follows, viz.: "He is guilty of counterfeiting who makes, in the semblance of

true gold or silver coin, any coin of whatever denomination, having in its composition a less proportion of the precious metal of which the true coin intended to be imitated is composed than is contained in such true coin, with the intent that the same should be passed in this State or elsewhere." Penal Code, art. 459.

It will be seen that the indictment follows the language of the particular article (art. 464) upon which it is based. As a general rule this is all that is required in testing its sufficiency. Clark's Cr. Laws of Texas, p. 420 and note. But it is contended that this is not sufficient. We are inclined to believe otherwise. We do not think the pleader was required to aver in the indictment the constituents of counterfeiting. Defendant was not charged with counterfeiting. There is no analogy, as is claimed by defendant's counsel, between this and the crime of burglary. In the latter it is necessary not only to charge the burglarious entry but the particular felony also which the party intended to commit, because simply to charge that the entry was to commit a felony would not sufficiently and certainly apprise the defendant of what he was called upon to answer. The crime here charged is more nearly allied by analogy to assault with intent to murder; in which case it has never been held that murder should be defined, nor that the indictment should set out the constituents of that offense. *Mastin* v. *State*, 40 Texas, 19.

"According to the rules of pleading it is sufficient in an indictment to pursue the very words of the statute, if by so doing the act in the doing of which the offense consists is fully, directly, and expressly alleged, without any uncertainty or ambiguity." *Bigby* v. *State*, 5 Texas Ct. App. 101; *McFain* v. *State*, 41 Texas, 385. At one time a statute in every material respect similar to the one upon which this indictment is founded existed in Massachusetts, and in a case arising under it Ch. J. Shaw says: "The

object and policy of the statute we think obvious. It is manifestly so difficult to prove the fact of actually making counterfeit coin, that the statute intended to make the possession of instruments adapted to counterfeiting, with the criminal intent to use them, or cause or permit them to be used for that purpose, a crime subject to severe punishment. But the gist of the offense is the criminal intent, and therefore, the fact of the possession of such an instrument being proved, the intent was rightly left to the jury. . . . It (the statute) was intended to declare the possession of any instrument fitted and adapted for counterfeiting a crime if intended to be used for a criminal purpose." *Comm.* v. *Kent,* 6 Metcalf, 221. In that case both the indictment and the statute are set forth, and upon a comparison with the indictment before us and our statute, it will be found that they differ in no essential particular. In that case it was held that the statute offense was well stated and charged in the indictment. The indictment in *Kent's* case may also be found in 1 Whart. Precedents of Indictments (3d ed.), 353. Under a similar statute in Ohio, Mr. Wharton also furnishes us the form of a valid indictment, which is in no respect materially different from the one in this case. 1 Whart. Precedents of Indictments (3d ed.), 325. And so also the Virginia form for an indictment of the same character. 1 Whart. Precedents, 344.

We hold that these authorities are conclusive as to the validity and sufficiency of the indictment, and that the court did not err in overruling the motion in arrest of judgment upon this ground.

A bill of exceptions was reserved to the testimony of the State's witness, Goree, establishing the handwriting of Weaver. Weaver was a convict in the penitentiary. Goree had received a letter purporting to have been written by Weaver, and subsequently Weaver spoke to him about the contents of the letter, and admitted that he had

written it.  Ordinarily this would, it seems, have been sufficient to qualify Goree to testify as to the handwriting of Weaver, by comparison, taking this letter as a basis of comparison.  For, Mr. Greenleaf says: "One mode of acquiring a knowledge of handwriting is from having seen letters, bills, or other documents purporting to be the handwriting of the party, and having afterwards presumably communicated with him respecting them, and acted upon them as his; the party having known and acquiesced in such acts founded upon their supposed genuineness."  1 Greenl. Ev. § 557; *Haynie* v. *State*, 2 Texas Ct. App. 168.

But it is insisted that the admission of Weaver that he wrote the letter to Goree which the latter made the basis for his comparison of the handwriting thereof with the receipt found in possession of the defendant, as evidence was wholly inadmissible because Weaver was a convict, and no testimony or admission of his could be used as evidence against defendant, his conviction for felony having rendered him infamous and utterly incompetent even to testify under oath.  We are of opinion the objection to the testimony was well taken and should have been sustained.  The object and purpose of the law is to render a convicted felon incompetent to testify in any case.  If he cannot testify in person, how can he state facts to others and thereby enable them to testify to matters wholly derived from him?  To permit this would be to abrogate the law which, as a part penalty for his crime, renders him forever incompetent to testify and forever unworthy of belief.  No fact stated by or derived from him, can, so long as the disability remains, be detailed as testimony by another or used as evidence against a third party for any purpose.

The first bill of exceptions was saved to the testimony of officials of the penitentiary, who stated that certain convicts to whom defendant had access were convicted

for counterfeiting,— the objection being that the best evidence of that fact would be the record of their conviction. Such ordinarily would be the case.   But in this instance we are of opinion that the officials, having these convicts in charge and being charged with their custody by legal process certifying their conviction, and not being in possession of the record evidence or required by law to have it, could state the offense of which they had been convicted as the same had been certified to them.   Besides, the fact of the conviction of these parties for counterfeiting was a mere collateral matter, and only a circumstance in connection with all the other evidence, pertinent to go to the jury in explanation of the fact of defendant's having counterfeiting materials in his possession, and the probable intent and purpose of his possession.

Nor did the court err in allowing the prosecution to introduce in evidence the receipt found upon the person of defendant, and permitting experts to testify that the composition formed in accordance with the receipt would produce a material used in counterfeiting silver coin.

One ground of the motion for new trial was that one of the jurors, W. O. B. Gillespie, after having been tested upon his *voir dire*, and though examined as to his bias or prejudice against defendant, had stated that he had none and had formed no conclusion on the question of his guilt or innocence, yet was in fact prejudiced and had formed an opinion against defendant, as was evidenced by a remark made by said juror to two fellow-jurymen before the jury was fully impaneled, to the effect that "he was a bad juror for defendant."   This ground of the motion is supported by the affidavits of the two jurors to whom the remark was made, and also the affidavits of the defendant and his counsel that these facts were unknown to them until after the trial, and further that in accepting the jury the defendant had not exhausted his challenges when it was completed.   The State produced the counter-affidavit of

the juror Gillespie, to the effect that he was not biased or prejudiced against defendant, and that at the time he qualified himself as a juror he had formed no conclusion as to the guilt or innocence of the accused. It is to be noted, however, that this juror nowhere denies that he made the remark attributed to him, and under the circumstances mentioned by the other two jurors, and no explanation of this fact is attempted.

A defendant in a criminal prosecution is entitled to a fair and impartial jury, and a verdict of conviction, however just, should be above suspicion as to its fairness and entire compatibility with the just and pure administration of the law. *Hanks* v. *State*, 21 Texas, 526; *Henrie* v. *State*, 41 Texas, 573; *Nash* v. *State*, 2 Texas Ct. App. 362. If the remark had not been made, the juror should have so stated; if made, but made in jest, that fact should have been stated in connection with the other facts stated in the affidavit. *O'Shields* v. *State*, 55 Ga. 697.

The judgment of the court below is reversed and the cause remanded.

*Reversed and remanded.*